## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW MEXICO

STANDARD INSURANCE COMPANY,

      Plaintiff,

      v.                                       Civ. No. 22-664 DHU/SCY

REBECCA ARMIJO LAKEY an individual,
XENA LAKEY, and E.L., a minor by and
through his mother HEATHER SHREVES, on
behalf of THE ESTATE OF RICHARD ALAN
LAKEY,

      Defendants.

## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

The decedent, Richard Alan Lakey, held a life insurance policy with Plaintiff, Standard Insurance Company. Upon Richard Lakey's death, Standard filed an interpleader complaint to resolve conflicting claims for the life insurance proceeds in Standard's possession. The claimants are his ex-wife (represented), adult grandchild (unrepresented) and minor grandchild (represented only through the Court's appointment of a guardian ad litem). In addition to these claims, Standard makes claims for its costs and attorney's fees, to be paid from the life insurance proceeds. Although the Court appointed a guardian ad litem (GAL) for the minor, and although she has not requested fees for work she has done thus far, any future work the GAL performs will likely need to be paid for from the life insurance proceeds. Because the amount of life insurance proceeds available are modest ($52,000), the need to pay fees from the corpus of the life insurance policy threatens to quickly erode the amount available to claimants. In an effort to reduce the amount of fees used to finance further litigation, I held an early settlement conference. At this July 27, 2023 conference, the parties reached a resolution about how the life insurance

proceeds should be apportioned once Standard's attorney's fees are deducted. At the conclusion of the settlement conference, I went on the record and discussed the factors the Tenth Circuit identified as relevant to a fairness hearing. *Jones v. Nuclear Pharmacy, Inc.*, 741 F.2d 322 (10th Cir. 1984); *see* Doc. 41 (clerk's minutes).

For three reasons, I recommend that the Court accept the settlement in this case without conducting any further hearings, order the filing of closing documents, and then dismiss this case. First, any continued litigation will further erode the corpus of life insurance proceeds. Second, and relatedly, the settlement agreement provides that each of the three claimants receive a specific dollar amount. What each party has agreed to receive is a material term of the settlement agreement. If the corpus of the available proceeds is reduced, so will be each parties' share. This may result in one or more of the parties seeking to withdraw from the settlement agreement. Third, as set forth below, each of the *Jones* factors has been satisfied. To the extent any party disagrees with my analysis below and believes that the Court should conduct further hearings, any party may file objections saying so.

## PROCEDURAL HISTORY

Plaintiff Standard Insurance Company, seeking to resolve competing claims for a life insurance policy it issued, filed this interpleader under 28 U.S.C. § 1335. The complaint, filed September 9, 2022, states that Plaintiff issued a policy of group life insurance that covered Richard Alan Lakey at the time of his death. Doc. 1 ¶¶ 9-11. As a result of Richard Lakey's death on January 5, 2022, a life insurance benefit in the total amount of $52,000 became payable under the Policy. *Id.* ¶¶ 12-13.

A dispute arose as to the beneficiary of the proceeds, as Richard Lakey was not survived by a spouse, children, parents, or siblings. *Id.* ¶ 21. The benefits were payable to his Estate. *Id.* ¶¶ 20, 22. However, no Estate was opened and no personal representative was appointed for the Estate. *Id.* ¶ 4. Defendant Xena Lakey and Defendant J.E.L.,[1] a minor by and through his mother Heather Shreves Lakey, are the only surviving grandchildren of Richard Lakey and, as such, are the intestate heirs of Richard Lakey. *Id.* ¶ 5. Even so, Rebecca Armijo Lakey, Richard Lakey's ex-wife, claims entitlement to the proceeds despite her divorce from Richard Lakey. *Id.* ¶ 23.

In a letter mailed to the Clerk's Office and post-marked February 3, 2023, Heather Lakey Shreves represented that she is J.E.L.'s mother and claimed that J.E.L. is "Intitled [sic] to Richard's money." Doc. 20. Because Ms. Shreves is not an attorney and so cannot represent J.E.L., on February 9, 2023, I issued an order declining to construe Ms. Shreves' letter as J.E.L.'s answer to the complaint. Doc. 22. Further, "concerned about the relatively low value of the life-insurance proceeds at issue in this case and the potential for its erosion via Plaintiff's claim for reimbursement of its costs from the proceeds (*see* Doc. 1 at 5 ¶ G) and the costs for a court-appointed guardian ad litem," I "stay[ed] the deadline for E.L.'s answer until Xena Lakey either answers or is found to be in default, and pending further order of the Court regarding E.L.'s answer deadline." Doc. 22 at 3. When the time for Xena Lakey to file an answer passed with no filing, I then ordered Plaintiff to file a status report regarding the prosecution of its claim against Xena Lakey. Doc. 23. Standard responded by filing a motion for a default judgment against Xena

---

[1] Although the caption and the complaint refer to the minor as "E.L.," the Guardian ad Litem has advised that the initials of his full legal name are "J.E.L." J.E.L. turned eight years old in August 2023.

Lakey, based on her failure to answer Standard's complaint. Doc. 24. After receiving this motion, Xena Lakey contacted Standard and informed it that she lives out of state and cannot afford an attorney. Doc. 25.

I then set up a telephonic status conference. Prior to this conference, Xena Lakey emailed my Chambers to let me know that she was due to give birth in one week; could not afford an attorney; "was definitely interested in getting this situation resolved asap"; and would like to know what her options were. Doc. 30. In the meantime, Standard filed a motion requesting to deposit the amount of the $52,000 death benefit at issue, minus its own fees and costs incurred for the interpleader action, with the Clerk of the Court. Doc. 29 at 1. In addition, Standard requested that, upon such deposit, it be dismissed from this action with prejudice and discharged from any further liability. *Id.*

All parties called in to the status conference I held on May 18, 2023. Doc. 32. During that status conference, I informed the parties that I was inclined to deny the motion for default judgment because Xena Lakey had called into the conference and because Standard did not follow the two-step process to obtain a default judgment set forth in Federal Rule of Civil Procedure 55. Doc. 32. Standard did not object to this proposal. *Id.* The Court further informed the parties that it must appoint a GAL for J.E.L. and that the money to pay for this GAL would come from the life insurance proceeds. *Id.* The parties further agreed that, because litigation of this case would quickly diminish the life insurance proceeds available, setting up a settlement conference as soon as possible would be in everybody's best interests. *Id.*

Under Federal Rule of Civil Procedure 17(c)(2), "The court must appoint a guardian ad litem—or issue another appropriate order—to protect a minor or incompetent person who is

unrepresented in an action." *See Mut. Life Ins. Co. of N.Y. v. Ginsburg*, 228 F.2d 881, 883-84 (3d Cir. 1956) (court has power to appoint a guardian to represent the interest of the minor claimants in interpleader action). Under this rule, I appointed a GAL (Gabrielle M. Valdez) for J.E.L. Doc. 34.

At the July 27, 2023 settlement conference, Kristina Martinez and Ben Osborn appeared as counsel for Rebecca Armijo Lakey. Defendant Xena Lakey appeared pro se. GAL Gabrielle Valdez represented the interest of J.E.L. and J.E.L.'s mother, Heather Shreves Lakey, was also present. Doc. 41. I excused Standard from the settlement conference because it took no position as to how the life insurance proceeds should be apportioned and because its presence would reduce the amount of life insurance proceeds available by driving up Standard's attorney's fees. Doc. 41. Standard did, however, provide a draft Release in advance of the settlement conference. After four and a half hours of negotiations, the parties attending the settlement conference reached a compromise.

Immediately after the parties reached the agreement, I went on the record with the parties. First, I read each word of the Release into the record and made sure that Rebecca Armijo Lakey, her attorneys, Xena Lakey, Heather Shreves Lakey, and GAL Gabrielle Valdez agreed to the terms of the Release, which incorporated the terms of the settlement. I further addressed each of the *Jones* factors, asked the parties if they objected to any of my conclusions regarding the *Jones* factors, and provided the parties an opportunity to make a record regarding any of these factors. Doc. 41.

## LEGAL STANDARD

The Court has both the authority and the obligation to review the fairness of a settlement involving a minor child. That authority stems from New Mexico common law, which states that "a next friend or guardian ad litem acting for a minor may negotiate a compromise or settlement, but such compromise or settlement is not binding on the infant in the absence of judicial approval." *Garcia v. Middle Rio Grande Conservancy Dist.*, 1983-NMCA-047, ¶ 28, 99 N.M. 802, 808, overruled on other grounds by *Montoya v. AKAL Sec., Inc.*, 1992-NMSC-056, ¶ 28, 114 N.M. 354. "A trial court in an action involving minor children has a special obligation to see that they are properly represented, not only by their own representatives, but also by the court itself." *Id.* ¶ 30. "In passing upon settlements dealing with claims or rights of minors, the court must determine whether the approval of a compromise would be in the best interests and welfare of the minor child." *Id.* (citing *United States v. Reilly*, 385 F.2d 225 (10th Cir. 1967)). A court is required to reject a settlement "[w]hen a settlement involving a minor is presented to a court for approval and the information before the court indicates that the settlement is not fair to the minor." *Shelton v. Sloan*, 1999-NMCA-048, ¶ 42, 27 N.M. 92, 100. The factors the Tenth Circuit has indicated that courts should consider in determining whether a settlement involving a minor is fair are:

> (1) whether the proposed settlement was fairly and honestly negotiated;
>
> (2) whether serious questions of law and fact exist, placing the ultimate outcome of the litigation in doubt;
>
> (3) whether the value of an immediate recovery outweighs the mere possibility of future relief after protracted and expensive litigation; and
>
> (4) the judgment of the parties that the settlement is fair and reasonable.

*Jones v. Nuclear Pharmacy, Inc*., 741 F.2d 322 (10th Cir. 1984).

**DISCUSSION**

A.     Legal and factual background

Standard alleges in the complaint that "On October 24, 2005, Richard Alan Lakey designated Rebecca Armijo Lakey, his wife, as the beneficiary of the death benefit under the [Standard] Group Policy." Doc. 1 at 3. The couple then divorced in 2017. *Id*. In 2022, Richard Alan Lakey died with no surviving spouse, parent, child, or sibling. *Id*. at 3-4.[2]

Under New Mexico law, a divorce will revoke any "revocable[] disposition or appointment of property made by a divorced individual to the former spouse in a governing instrument" executed during the marriage. N.M.S.A. § 45-2-804(B)(1)(a). Because Richard Lakey and Ms. Rebecca Armijo Lakey divorced and Mr. Lakey did not thereafter redesignate Ms. Rebecca Armijo Lakey as the life insurance beneficiary, this statute presumptively revokes her right to receive proceeds, despite her being listed as the named beneficiary.

The legal analysis, however, does not end here. Neither the New Mexico Supreme Court nor the New Mexico Court of Appeals has spoken to whether an ex-spouse can overcome N.M.S.A. § 45-2-804(B)(1)(a) with evidence that the decedent intended to keep the ex-spouse as a beneficiary despite the divorce. New Mexico District Court Judge Judith Herrera, however, has issued two well-reasoned decisions in which she thoroughly analyzed cases from other states with similar statutes. Judge Herrera concluded that, although N.M.S.A. § 45-2-804(B)(1)(a)

---

[2] Neither J.E.L. nor Xena Lakey filed an answer to the complaint. However, for settlement purposes, they did not dispute these facts. Nor did any party consider these uncontested background facts to be confidential settlement negotiations.

presumptively removes an ex-spouse as a beneficiary, this presumption can be rebutted. *Lincoln Benefit Life Co. v. Guerrero*, No. 14cv1077 JCH/WPL, 2016 WL 4547157 (D.N.M. June 27, 2016); *Primerica Life Ins. Co. v. Montoya*, No. 18cv109 JCH/CG, 2019 WL 1242677 (D.N.M. Mar. 18, 2019).

Specifically, Judge Herrera found that "§ 45-2-804 creates a presumption that divorce revokes the designation of one's spouse as the beneficiary of an insurance policy, but that presumption can be rebutted if the former spouse meets his or her burden to do so by a preponderance of the evidence." *Lincoln Benefit Life Co.*, 2016 WL 4547157, at *6. In *Lincoln*, an ex-spouse presented an affidavit averring that "the Decedent's desire was that she would continue on as the primary beneficiary . . ." *Id*. at *2 (internal quotations omitted). The ex-spouse further represented that "she paid the monthly premiums on the policy held by the Decedent, with the reasonable expectation and understanding that she was the designated beneficiary who would receive the policy." *Id*. Judge Herrera concluded that this evidence was "insufficient to carry her burden to present proof, by a preponderance of the evidence, that Decedent actually intended her to be the beneficiary of the Policy despite their divorce." *Id*. at *14. This is because "self-serving statements made by the decedent only to the beneficiary and not witnessed by any other person are insufficient because such evidence has insufficient guarantees of trustworthiness to carry the day." *Id*. (internal quotations and citations omitted).

Three years later, Judge Herrera had occasion to again analyze N.M.S.A. § 45-2-804(B)(1)(a), but this time in a case that did not primarily rest on the self-serving affidavit of an ex-spouse. In *Primerica*, the decedent similarly designated his spouse in a life insurance policy, the decedent and his spouse divorced, the divorce decree did not address life insurance benefits,

and the decedent made no post-divorce change to the beneficiaries in the policy. 2019 WL 1242677, at *1. Judge Herrera reiterated her analysis from *Lincoln Benefit Life Co.* that N.M.S.A. § 45-2-804(B)(1)(a) created a rebuttable presumption, and that "self-serving statements made by the decedent only to the beneficiary and not witnessed by any other person are also insufficient" to rebut the presumption. *Id.* at *4.

"On the other hand, the putative beneficiary can meet her burden, by a preponderance of the evidence, either by providing a writing from the decedent in compliance with the terms of the life insurance policy, or by presenting an admissible statement of the decedent's intent made to a third-party with no interest in the beneficiary designation." *Id.* In *Primerica*, the ex-spouse

> submitted the affidavit of Mr. Carlos Craine, who made three relevant statements: (1) he was Joseph's "partner;" (2) that "after the divorce Cynthia and Joseph remained in constant contact and were very much a couple in love;" and that (3) "Joseph said in [Mr. Craine's] presence that he wanted Cynthia Montoya to have his life insurance policy money so that Cynthia could pay for his funeral expenses and be taken care of after his death."

*Id.* at *5. The Court found, based on this evidence, the trier of fact could reasonably conclude the decedent intended to keep his ex-spouse as the beneficiary. But because Mr. Craine was not a "neutral financial agent," the affidavit was insufficient for summary judgment because it was untested by cross-examination and the trier of fact would still have to resolve the issues of Mr. Craine's trustworthiness and whether he was truly a "disinterested" party. *Id.* at *6.

The facts in the present case are similar to those in *Primerica*. Rebecca Armijo Lakey provided an affidavit from Scott Fuqua, the attorney who represented Richard Lakey during his divorce proceedings and spoke directly to him about his intent. Doc. 8-1. Mr. Fuqua avers that

> At the time of the divorce, Mr. Lakey was recovering from a stroke and was living in an assisted living facility. Mr. Lakey reported to me that Mrs. Armijo Lakey visited him almost daily, helped care for him, and supported him in his recovery.

Mr. Lakey also expressed to me that although he and Mrs. Armjio Lakey were getting divorced, they remained close and she remained his primary family support system. Mr. Lakey expressed to me that given his and Mrs. Armijo Lakey's ongoing relationship and his lack of strong relationships with any other family members, including his son and grandchildren, he wished to keep Mrs. Armijo Lakey as the beneficiary of and custodian of his assets.

For example, the parties agreed that Mr. Lakey's personal possessions would remain in Mrs. Armijo Lakey's home. They agreed that neither was required to refinance their properties after the divorce. They agreed that Mrs. Armijo Lakey would receive Mr. Lakey's pension and social security benefits and be responsible for paying down their debts. They set up a Medicare set aside trust that would allow Mr. Lakey to continue receiving benefits for Mrs. Lakey's benefit without losing Medicare eligibility.

At all times, Mr. Lakey was clear that he intended for Mrs. Armijo Lakey to continue to be the beneficiary and recipient of his various benefits.

Doc. 8-1 ¶¶ 5-8.

During settlement discussions, Rebecca Armijo Lakey also asserted that Richard Lakey was estranged from his son (who predeceased him) and, as a result, had very little contact with that child's son (J.E.L., his grandson).[3] Similarly, she asserted that Richard Lakey had very little contact with his granddaughter, Xena Lakey. In contrast, and consistent with Mr. Fuqua's affidavit, Ms. Rebecca Lakey represented that, even after their divorce, she served as the primary caregiver to Richard Lakey, who had suffered a stroke in 2016. She claimed that, in the course of taking care of him, she paid some bills he incurred after their divorce that he could not pay. She asserted that she was with him when he passed and, at his request, his ashes are buried on land she

---

[3] Rebecca Armijo Lakey provided background information in a pre-settlement conference letter that she sent to me. Although information learned and discussed as part of a settlement conference is typically confidential, Rebecca Armijo Lakey, through her attorneys, advised that they do not consider this background information confidential. Therefore, I provide her factual contentions here, for the Court's review.

owns, next to where she intends to be buried when she dies. She stated that her daughter wrote his obituary and that she arranged services for him, which neither Xena Lakey nor J.E.L. attended.

At the settlement conference, I discussed Judge Herrera's opinions, while noting that those opinions are not binding on the presiding judge in this case or on the New Mexico Court of Appeals or New Mexico Supreme Court.  I further discussed the evidence Ms. Armijo Lakey might be able to present in support of her contentions and what evidence Xena Lakey and J.E.L. would be able to present related to the nature of their relationship with Richard Lakey.

Before the settlement conference, the GAL had reviewed several documents. She had researched the reasons Richard Lakey and Rebecca Armijo Lakey divorced, read their marital settlement agreement, located and read Richard Lakey's obituary, and reviewed Richard Lakey's hospice care records. Further, in an effort to maximize the amount of money J.E.L. could obtain, she generously volunteered to do her GAL work in this case, up through settlement discussions, pro bono, with the understanding that the fees she could have obtained would be credited to J.E.L.

The terms of the negotiated settlement are attached in a sealed appendix. I recommend the Court approve the attached terms of settlement without a further fairness hearing. As explained above, after the parties reached a settlement, I discussed the *Jones* factors on the record and provided the claimants the opportunity to respond to or contest my findings. Instead of contesting or objecting to my findings, all claimants concurred with them. In addition, all parties have a further opportunity to file objections to my analysis of the *Jones* factors I make below, in this Proposed Findings and Recommended Disposition. Finally, a fairness hearing would impose further costs on all the parties that is not justified by the relatively limited amount of proceeds available. Increasing the costs imposed on the parties, which includes the cost of their time and

the cost of a delay in receiving their money, would likely further erode proceeds in the fund, leaving the parties with less money to apportion than the amount apportioned at the July 27 settlement conference. This could lead to one or more of the claimants moving to pull out of the settlement agreement.

B.   *Jones* Factors

I analyzed the *Jones* factors on the record immediately after the July 27 settlement conference and provided all claimants and counsel an opportunity to respond. I now summarize and supplement those findings.

1.   Whether the proposed settlement was fairly and honestly negotiated.

The terms of settlement were fairly and honestly negotiated. Some claimants submitted pre-settlement letters and I reviewed them. I had extensive caucus discussions with all claimants separately, thoroughly discussed the advantages and disadvantages of settling, and explained what proceedings would look like absent a settlement. The settlement was negotiated at arms-length. Each claimant voluntarily agreed to the settlement. The GAL in particular put a considerable amount of time into this case pro bono in order to assess the likelihood that J.E.L. would be able to obtain money if the case were litigated. I stressed to all parties that they are free not to settle and that declining to reach a settlement would in no way be used against them.

2.   Whether serious questions of law and fact exist, placing the ultimate outcome of the litigation in doubt.

Absent settlement, the parties would contest whether New Mexico law allows Rebecca Armijo Lakey to overcome N.M.S.A. § 45-2-804(B)(1)(a). Judge Herrera's opinions are persuasive, but not binding. Her opinions are a prediction of what the New Mexico Supreme Court might rule, and the presiding judge in this matter, or the Tenth Circuit, could reach a

different conclusion. The New Mexico Supreme Court or Court of Appeals might also come out differently. The facts concerning the trustworthiness of Rebecca Armijo Lakey's evidence, as well as the relationship each claimant had with the decedent, would also be at issue at a trial. Thus, at least some factual issues likely would be contested. Accordingly, there are serious questions of law and disputes of fact that place the ultimate outcome of this litigation in doubt.

3.    <u>Whether the value of an immediate recovery outweighs the mere possibility of future relief after protracted and expensive litigation.</u>

This factor most strongly weighs in favor of reaching a settlement. The value of an immediate and swift recovery vastly outweighs the possibility of greater future relief after protracted and expensive litigation. Due to the fees claimed by Standard and the possibility of a litigation GAL becoming necessary for J.E.L., contesting issues via motions practice or trial would reduce the corpus of the life insurance proceeds until virtually no benefit is left for any prevailing claimant. *See Mut. Life Ins. Co. of N.Y. v. Ginsburg*, 228 F.2d 881, 883-84 (3d Cir. 1956) (court has power to appoint a guardian to represent the interest of the minors and allow compensation for the reasonable value of the services from the fund itself). In addition, both Xena Lakey and Heather Shreves Lakey (Doc. 30 and as stated on the record on July 23, 2023) have expressed a strong desire to avoid litigation.

With respect to Xena Lakey's claim, she has stated she does not have the ability or means to hire an attorney. She lives out of state with limited means to travel to New Mexico. It would be difficult for her to navigate her way through the discovery process, legal briefing, and trial.

With respect to J.E.L.'s claim, I recognize that a very capable GAL has represented him under Rule 17. However, she has advised that she cannot litigate the entire case pro bono. It does not appear that J.E.L.'s mother has the financial means to hire an attorney. To the extent the Court

would appoint an attorney to represent the interests of the minor in litigating the case, the attorney's fees would be paid from the life insurance proceeds.

In my opinion, if Rebecca Armijo Lakey were able to prove her allegations at trial, a jury would likely conclude that she is entitled to the life insurance proceeds at issue. In other words, if Xena and J.E.L. made it to trial, they could very well suffer an adverse verdict and obtain nothing. Further, because the proceeds would be used to pay GAL expenses, even if they obtained a favorable verdict, the amount available to them after trial would likely be minimal.[4]

I find that the settlement of J.E.L.'s claims is fair, reasonable, and in the best interests of J.E.L. As stated on the record, Heather Lakey is aware that by entering into this settlement on behalf of her son, J.E.L., she is giving up J.E.L.'s constitutional right to trial by jury, where a jury could award J.E.L. more money than the amount agreed to in settlement, less money, or no money at all. Considering the numerous factors at play, Heather Lakey expressed a strong desire that the Court approve J.E.L.'s settlement as described herein. Further, Heather Lakey is aware that neither J.E.L. nor his heirs and/or assigns, shall be able to seek additional amounts from Standard Insurance Company in the future regarding these claims and that this settlement constitutes full and complete resolution of any and all claims that J.E.L. has, or may have, against Standard Insurance Company for any life insurance proceeds under the group life insurance Standard Policy No. 645743-A at issue, as a result of the allegations raised in the Complaint in Interpleader filed on September 9, 2022 (Doc. 1). I further find that it is in the best interest of the minor, J.E.L., that J.E.L.'s settlement monies be distributed as stated in the sealed appendix.

---

[4] I do not analyze the benefit to Standard of the settlement, or fees Standard would expend at trial, as the Court could grant its motion to deposit funds and be dismissed from the case before trial.

I find that Heather Lakey, as parent and guardian of J.E.L., understands and agrees that these settlement proceeds belong solely to J.E.L.. Heather Lakey is under a fiduciary duty to safeguard and protect this money for J.E.L.'s sole benefit and this money may not be used by Heather Lakey or any other person, for any reason, including food, clothing, or shelter for J.E.L., or for any other purpose, other than as set forth in this Order. Heather Lakey understands that the Court may request an accounting of these funds and proof that the funds are used in accordance with this Order. Should Heather Lakey, or anyone else, spend J.E.L.'s funds, or make any disbursements that are inconsistent with this Court's Order, that person shall be required to pay the funds back and may, in addition, be subject to contempt of court proceedings. The instrument into which J.E.L.'s funds are deposited is also designed to ensure that only J.E.L. will have access to funds from this settlement, and that J.E.L. will not have such access until reaching adult status.

       4.       <u>The judgment of the parties that the settlement is fair and reasonable.</u>

All claimants agreed to the settlement after considering the advantages and disadvantages and indicated this is a settlement which they wish to enter. In addition, I note that J.E.L.'s GAL did a great deal of research and preparation for the settlement conference, that she agreed to give up her fees so that J.E.L. could receive more money from the fund, and that she believes this is a favorable settlement for J.E.L. These factors provide additional assurance that the interests of the minor are being protected by this settlement.

       C.       <u>Standard's Fee Request</u>

Standard requests its fees for bringing this interpleader, citing *Transamerica Premier Ins. Co. v. Growney*, 70 F.3d 123, 1995 WL 675368 at *1 (10th Cir. Nov. 13, 1995) (unpublished table decision) (recognizing the "common practice" of reimbursing an interpleader plaintiff's fees

and costs out of the fund); and *American Fidelity Assur. Co. v. Humphreys*, No. 17cv979, 2019 WL 486317 at *2 (D.N.M. Feb. 7. 2019) (same). Standard updated its fee request from the amount in its motion to $7,334. Doc. 42.

Standard's attorney, Ann-Martha Andrews, is a shareholder in the law firm of Ogletree, Deakins, Nash, Smoak & Stewart P.C. Doc. 29-1 at 2 ¶ 2. She has been admitted to practice law since 1989. *Id.* ¶ 4. Her practice is concentrated on the litigation of employee benefit disputes and she has litigated hundreds of employee benefits cases, including interpleader matters, across the United States. *Id.* ¶ 5. She has spoken on and authored articles on the subject of employee benefits litigation. *Id.* Her hourly rate is $330 and work performed by a paralegal has been billed at $140 per hour. *Id.* ¶ 8. I find these rates reasonable for an attorney of her experience in this market. I also find the paralegal rate to be reasonable.

The number of hours reflect time to investigate the matter and legal issues; prepare the interpleader complaint; locate and serve all of the interested party-defendants; prepare and file a motion to serve defendant Xena Lakey by publication when it appeared she could not be served by other means; review the pleadings and other filings by the opposing parties; coordinate and prepare the parties' Rule 26 Report; communicate repeatedly with the pro se defendants; file a motion to default defendant Xena Lakey; and attend the initial scheduling conference. *Id.* ¶ 7. The updated hours reflect preparing the motion to default Xena Lakey, preparing the motion to deposit, attending the status conferences, and preparing the settlement release. Doc. 42. Ms. Andrews submitted her hourly billing records *in camera* and I reviewed them and conclude they are reasonable, with the exception of one category. I do not recommend awarding fees for time spent on the motion for default judgment that was denied because of failure to follow the correct

procedures (Docs. 24 & 35). After reviewing Standard's fee petition, the work performed in bringing and prosecuting this lawsuit, and counsel's hourly rate, I recommend the Court find that an amount of $7,000 for Standard's fees is fair.

      **THEREFORE**, I recommend the Court rule as follows:

      1.      Standard's Motion To Deposit Interpleader Funds And Be Dismissed (Doc. 29) is GRANTED IN PART AND DENIED AS MOOT IN PART.

      2.      Standard shall pay the beneficiaries directly in the amounts ordered by the Court, retaining $7,000 for its own fees, as stated in the sealed appendix.

      3.      The settlement in the amount stated in the sealed appendix for J.E.L. as a result of the allegations raised in the *Complaint in Interpleader* filed on September 9, 2022 (Doc.1), is hereby approved as being fair, reasonable, and in the best interest of J.E.L.

      4.      All claims belonging to Rebecca Armijo Lakey, Xena Lakey, and Heather Lakey individually, and as parent and next friend of J.E.L., and all of J.E.L.'s claims which were or which could have been brought by Heather Lackey on behalf of her son against Standard Insurance Company, will be dismissed with prejudice upon submission of closing documents.

      5.      All immunities and privileges available to the Guardian ad Litem, as articulated by the Tenth Circuit in *Dahl v. Charles F. Dahl, M.D., P.C. Defined Ben. Pension Tr.*, 744 F.3d 623, 630 (10th Cir. 2014), shall be extended to the Guardian ad Litem in this matter, and such Guardian ad Litem, Gabrielle M. Valdez, shall be absolutely immune from any liability for her actions taken pursuant to this appointment, as her participation in this case was in furtherance of the judicial process, *Fuller v. Davis*, 594 F. App'x 935, 939 (10th Cir. 2014). She is hereby released from her duties.

6.    The parties shall submit closing documents within 30 days of the entry of the

Court's order, subject to requests for reasonable extensions of time.


_____
UNITED STATES MAGISTRATE JUDGE

**THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1). **A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the proposed findings and recommended disposition. If no objections are filed, no appellate review will be allowed.**